We'll hear argument this morning in Case 17-387, the Upper Skagit Indian Tribe v. Lundgren. Mr. Hawkins. Mr. Chief Justice, and may it please the Court, the Respondent sued the Tribe to challenge the Tribe's title of record to the property at issue. This Court has consistently held that sovereign immunity bars suits against Tribal governments. Respondent's own prayer for relief establishes that their suit is an attack on the Tribe's interest in the property, confirming that sovereign immunity bars their claim. Ginsburg Is it not the case that no other political entity would be immune from such a quiet title suit? Not the United States, not a State of the United States, not a foreign government. So you are claiming a kind of super-sovereign immunity for the Tribe that no one else gets. Justice Ginsburg, that, in fact, is not the title of the action. Correct. What are the Lundgren's supposed to do in this situation if they can't bring legal action affecting the Tribe? Your Honor, the Lundgren's are in a situation where, similar to other States that have been confronted with sovereign immunity, for example, in the Pottawatomie case where they were unable to enforce their taxing authority, and the Tribe, the Court recognized that sometimes sovereign immunity will lead to results that preclude individuals from being able to sue for relief. That being said, in this instance, it would be helpful for all of the parties to understand their legal standings before they engage in negotiations. It's our anticipation that once this case is removed or resolved, I beg your pardon, that we would hopefully be able to engage in a negotiation with Lundgren's. Well, you would be in a better position when that negotiation started, wouldn't you, if we have a ruling saying that you can't be sued? Either way, both parties would be more informed as to what their legal positions were during the negotiations, Your Honor. What happens generally if a Tribe buys land or thinks it is a place off the reservation and they send members of the Tribe there and somehow they are in possession of it or at least part of it, how is that dispute resolved? I don't understand the question. Well, what worries me is if there is sovereign immunity and if members of the Tribe, acting for the Tribe, obtain property, they have a building or an empty lot or somewhere, and they are there, and there is another person who believes he owns the property or the lot, the building, and so there are two different people, the Tribe and another group, both of which thinks they own a lot in New York City or Tulsa. How is that dispute resolved? Normally, we resolve it in a court. But how, in your opinion, will the dispute be resolved? What I'm thinking of is I joined a case saying there was broad sovereign immunity. I thought Congress would act, but it hasn't. And Tribes have business interests all over the country, all over the place. And how are they resolved? So I understand the Kiowa decision, Your Honor, and obviously that Congress did not act after that decision. No. So that's why I asked my question. Property disputes are fairly common, and you could get into really bad situations where the only resolution is force. That's why we have courts. And I want to know, how are they resolved? How should they be resolved if you can't sue the Tribe? So the precedent that this Court has recognized in both U.S. v. Alabama and the Minnesota case is that sometimes that will be the reality of sovereign immunity. That being said, by way of example, the fact that States can enforce taxes against Tribes have not precluded — I'm not talking about — What, what, what, just — for Justice Breyer's question. Suppose the Tribe owns property outside the reservation in Tulsa or New York. The State wants to condemn the land. Is there sovereign immunity or not? Sovereign immunity applies in that situation because the action is against the Tribal government's interest, and your holdings in Bay Mills specifically provides that an action against the Tribe is barred. It's Congress's respect to — Well, with respect to sovereign immunity, Joe Smith owns an empty lot next door to his house. One morning, because of some Tribal legacy or something, he wakes up and finds members of the I own the lot next to my house. I have my swimming pool there. He's quite wealthy. The Tribe members say, no, this is ours. Now, how is that dispute, since that decision that I joined, how is that dispute, kind of dispute which could arise all over the place, how has it been resolved? I can't believe there is no such thing by some form. So, again, that is a dispute that would be resolved out of the judicial process. The Philippines case establishes that if there is a dispute, the Court simply looks to the merits of the claim as it pertains to the interest that the Tribe has. If the action is against the Tribe's interest, and it is in this instance, it's registered title here, you're not confronted with a non-frivolous claim on the part of the Tribe. In the instances that you're describing, it sounds as though the Tribe's claims probably are going to be somewhat frivolous. No, no, I don't know if they're frivolous. But suppose they are. Suppose they are. Why doesn't the Tribe, how do you get around sovereign immunity if they are frivolous? The threshold issue is whether or not the action is directed against the Tribe. The Tribe has to establish a prima facie basis that it has an interest. Once that interest is established, the Court therefore would immediately lose its jurisdiction and the case should be dismissed. Well, what would happen in this situation? Let's say a State or the Federal Government wants to construct a highway, or maybe it's a pipeline, and there's opposition to this project. So the people who are opposed to the project enlist an Indian Tribe to buy a little parcel of land along the route of this highway or this pipeline. That would be the end of the project, would it not? That potentially would be the end of the project, yes. However, there would be remedies available that the U.S. Government could invoke. And it's important to keep in mind that what Bay Mills stands for specifically affords Congress the ability to step in and act in this situation. You mentioned Bay Mills a couple of times. What about footnote 8 in Bay Mills? There it says, We have never specifically addressed whether immunity should apply in the ordinary way if a tort victim or other plaintiff who has not chosen to deal with the Tribe has no alternative way to obtain relief. Doesn't that distinguish your reliance on Bay Mills? In Lewis v. Clark, you address footnote 8 in terms of if an action is directed against a Tribe, then you made the decision that that action was barred by sovereign immunity. So subsequent to Bay Mills and Lewis v. Clark, you clarified that an individual action against a Tribal employee would potentially give relief to an innocent victim. Well, how does that work? Yes, an individual action, I remember that from Lewis and Clark. But how does that work here? Are the Lundgrens supposed to sue anybody from the Tribe who goes onto the area that they claim to have adverse possession of? If they were able to frame the claim properly, Lewis v. Clark may provide them relief in that instance, yes. So every time somebody from the Tribe goes over the barbed wire fence that they say for since time immemorial has defined their property, they should sue them. Just have a lawyer there process. Is that a valid, a viable alternative remedy to a quiet title action? It is not. But again, I get back to the point that this Court has continually affirmed as relates to the significance of sovereign immunity. Does it make any difference that the Lundgrens had no notice when they bought the property that there was any Tribe in the picture? I could see if the Lundgrens bought the property and the Tribe is already there. But why shouldn't the Tribe, when it's taking from someone who doesn't have any immunity, step into the shoes of that person and be disabled from asserting sovereign immunity against someone who had no reason to believe that it was an Indian Tribe in the picture? Justice Ginsburg, in the instance where a case had already been started, the Tribe would step into litigation and its immunity would not apply because the jurisdiction of the Court would have already been asserted over the proceedings. I mean, there are no proceedings in court. But if there is no proceedings that are at issue and the Tribe purchased the property, the Tribe is exercising the rights that it has to defend its claim against Lundgrens. Keep in mind, the Lundgrens assert that they've had this property for over 40 years, never paying property taxes on it, never taking any action for that period of time to legally establish their claims. And now, all of a sudden, when the Tribe comes into title, they assert that they have a right. Well, the trial judge in the State said he had never seen a case of adverse possession clearer than this one. It seems to me you're arguing the merits of their adverse possession claim. And they would love to have you do that in court. I don't mean to get into the merits of the State case, Your Honor. This is – sovereign immunity is a Federal issue that preempts the State law and the merits of the underlying decision as it pertains to that. Mr. Hawkins, I mean, I guess the question is what is sovereign immunity and what does it entail? Even beyond the footnote in Baymills that the Chief Justice referenced, I think when you look at language of the kind that appears in Baymills and in other cases, what – which says that, you know, if Congress wants to change it, it's up to Congress to change it. The question is what is the it? In other words, what's up to Congress to change is deviations from the general law of sovereign immunity. And I think what the Lundgrens are saying here is that this is not part of the general law of sovereign immunity. And this goes back to Justice Ginsburg's question, that sovereign immunity typically by common law and historically includes this exception for immovable property. And so that's the baseline. It's – well, sovereign immunity as it historically exists, except as it historically exists, it just didn't include immunity from suits that related to immovable property. So if you look at the judicial history of the immovable property issue and in particular as it pertains to the cases involving foreign nations, the Court took action at the guidance of the State Department and the Court has consistently deferred to the State Department and the political branches as to whether or not it will exercise jurisdiction or it's prudent to exercise jurisdiction over those foreign sovereigns. So the Court has consistently recognized that immunity is in the hands of the political branches. Now, you ask how does this relate to Indian tribes and the significance and what is it? For a landless tribe like the upper Skagit, sovereign immunity has enabled it to purchase lands, take them into trust, and establish a reservation providing services for their members without being subject to third-party claims. That's essential where we are, because if you allow third parties to bring frivolous or meritorious claims against a tribe, the purse of the tribe is going to be spent on things— Counsel, along those lines, do you think you'd have a stronger case if the land had been taken into trust? And the land is purchased, as I understand it, in 2013, and I'm curious why it hasn't been taken into trust. We were in the process of getting everything ready for taking it into trust. But first, I'm sorry, to answer your question, no, we don't think that it would—that's not a distinction that makes a difference. Go ahead. Why doesn't it make a difference whether the land is held— In trust or whether it's in fee, immunity travels both on and off reservation. And in commercial context, Kiowa, you have a case where you have a note that the tribe determines that they're not going to comply with all the terms of commercial transaction. You say off reservation, immunity bars relief from the holder of the— But, of course, there the parties consented to deal with the tribe. They knew they were dealing with the tribe. That is correct. And they could have put in the note if they want a waiver of sovereign immunity or not. So this is different. I guess I'd like an answer to my question, though. Yes. Why should it make a difference whether it's in trust or not? It does not make a difference as to whether it's in trust or not. The tribe is the party that the action is being brought against. Immunity, therefore, is appropriate and should be applied here. But if it were in trust, then we would treat it as the land of the separate sovereign, right? It would be the tribe's land, just as it might be France. Now it's titled under the state's laws and is still part of the state. Does that resonate with you at all? And if that doesn't make sense, tell me why not. No, I think I understand the question, Your Honor. And the Minnesota case is a situation where you have the land taken into trust and Minnesota then sues the U.S. and the court finds that it's barred by sovereign immunity because the land is held in trust for the benefit of the tribe. But the reality is that the immunity isn't subject to what the particular transaction is. Your case law has been clear that immunity applies regardless of what the action is. It applies if the relief is being sought against the tribe because of the significance of it. Were the tribe not able to preclude suits from it, it could be subject to countless claims, taking away the ability to provide for its membership. Counsel, can I just ask a question about the immovable property argument, which was just raised in the merits brief here? If you had more time, what more would you argue to us? What more could you show us to prove that you were right, that this is not a part of the common law? You made an argument in saying it's a matter of practice, not common law. But what else could you show us if we gave you more time? That is difficult to answer, not having had the time to go back and look at what the law here. But what I would assert is that when you delve into the application of that proposed exception here, it is inherently in conflict with the underlying request that they have made in their original complaint. I fully accept that they only raised this in their merits brief. I'm asking you a very directed question. What other research would you do that could help you prove your argument? We would take the time to look at the application as it relates to other tribes specifically, but also how the political branches have been involved in that process and how the U.S. has addressed it. And the reality is that giving context to an exception to sovereign immunity is a very complex matter. And how that applies to tribes is a very complex matter. And it's not something that we, in a very short period of time, are fully able to respond to. You had a month since they filed their brief. That is correct, Your Honor. I suppose you just said, well, the tribe, being of the dignity of a sovereign, has the same kind of immunity as a sovereign nation would have. That is our position. Well, I don't know. A sovereign nation, I think since about 1750, has been an exception for a sovereign nation for immovable property. And therefore, if the nation of Canada comes and has a piece of land in North Dakota and the person who lives there says, I'm sorry, this belongs to me, not to Canada, and Canada says no, my understanding was there has been a longstanding exception to sovereign immunity. But that exception has been at the direction of the political branches. And that is exactly what we are asserting should occur here, should an exception be considered by this Court. If there are no further questions, I'd like to reserve time for rebuttal. Thank you, Counsel. Ms. O'Connell. Mr. Chief Justice, and may it please the Court. I'd like to start with Justice Kagan's question about what is the baseline here about what sovereign immunity entails. The baseline is sovereign immunity from suit. This is the Alexander Hamilton quote from the Federalist Papers. It is inherent in the nature of sovereignty not to be amenable to suit without consent. The immovable property exception is an exception that applies to other sovereigns, but that's because an exception to that general rule has been made. In the United States, the political branches control whether there are exceptions to that general rule of sovereign immunity from suit for the United States, for foreign states, and for Indian countries. Well, of course, this Court said in the permanent mission of India's case that the Foreign Sovereign Immunities Act was meant to codify the preexisting real property exception to sovereign immunity recognized by international practice. Correct. It was recognized by international practice as a matter of what the executive branch recognized when it was asserting immunity. And so why doesn't that same principle allow the Court to recognize that there's limit to sovereign immunity here under the very same principle? Well, I think that's because it is up to Congress. This Court has consistently said it's up to Congress to control and make exceptions to the immunity from suit of India. But I thought that we explained in Kiowa that foreign sovereign immunity actually started as a judicial doctrine. It was only later that it was taken over by the political branches. Well, I think what the Court said there, and I think that that quote was in it — well, I can't remember if it's initially in Verlinden, B.V., or Kiowa, but that the initial judicial doctrine was from the Schooner Exchange v. McFadden was that it's general immunity from suit. That's the general rule. Breyer. But it doesn't say in the — I mean, my law clerk has here, which I guess he got out of the briefs, I don't know, we have Vattel, Cornelius Van Binkershock in 1744, as well as Lodderpact, who's certainly this big authority. They don't talk about exceptions. They just say a prince, that's Binkershock, he says — he says, or maybe it's the other one. He says, in sovereigns, several sovereigns have feasts and other possessions in the territory of another prince. In such case — cases, they hold them in the manner of private individuals. And then we have Vattel and all these others, and they say the same thing, really. They don't talk about exceptions or not exceptions. So if you were to have a quiz, what was the law of sovereign immunity in 1760, you know, I guess you'd have to say the law is that the prince buys an apartment store in Iowa. I'm sorry, he's just like another Iowan. I'm not — I'm not sure that any of those sources are talking about sovereign immunity from suit. I mean, those quotes could equally apply to whether the prince has to pay property taxes, whether the land is subject to the regulatory jurisdiction of the State, as opposed to you could sue the foreign nation. Kagan. Kagan. But if you look at two cases, Ms. O'Connor, one is Schooner Exchange, which talks about foreign States, and then the other is this Georgia v. Chattanooga, which is individual States in another State's jurisdiction. I mean, both of those seem to be indicating that there's this longstanding rule that when the prince goes someplace else and buys land there, he's just going to be treated like anybody else. And it doesn't have much to do with any kind of executive action and doesn't have much to do with the States all agreeing about something at the constitutional convention. It's just a sort of rule that when the prince pops up in some other jurisdiction and buys a piece of land, he's no longer the prince. O'Connor. That, Justice Kagan, I think is an exception to the general rule of immunity from suit. This Court called it an exception in Permanent Mission of India. Congress certainly called it an exception in the Foreign Sovereign Immunities Act, where it lays out that the baseline rule is that sovereigns are completely immune from suit unless an exception applies. Kagan. I guess what my point is, is not whether it should be denominated an exception or not an exception, but whether this is the kind of historic, traditional, long-standing rule that we shouldn't expect Congress to have to put in, that it just sort of goes into the doctrine because that is part of the doctrine from long, long ago, which is a very different thing from saying, look, it's up to Congress to really, to treat, you know, to start modifying terms of the doctrine that have existed for a long time.  Congress's ability to create a comprehensive exception or solution here and weigh the policy interests on both sides is what should counsel this Court not to begin recognizing judicial exceptions to sovereign immunity from suit. Kennedy. Well, of course, you call it, again, as Justice Kagan has indicated, you call it an exception. Others may call it just a limit to the general rule. Right. But I think the point I want to make is that, you know, when Congress passed the Quiet against the United States, it made various policy judgments. The suits could only be brought in Federal court. It imposed a statute of limitations. It made exceptions for adverse possession claims, for water rights. And under your view of this case, suppose that a tribe on land that it owns in a State but outside the reservation puts up a high-rise building in violation of the zoning law. They're exempt? They can develop anywhere without reference to zoning laws? They're not exempt from the regulatory jurisdiction of the State if it's just fee land. But the immunity from suit would still attach. So, Connell, I've been hoping to hear from you about what the baseline rule was versus the exceptions. And I'm still hopeful we might get an answer to that question. Why do you and what's your best authority for the proposition that the baseline rule of common law was total immunity, including NREM actions? I think it's the Federalist Papers, the Hamilton quote from the Federalist Papers. Also, Schooner Exchange v. McFadden lays that out as a general rule for foreign States, at least. But, again, I think one important point that I want to get out here is that if Congress were to look at this and decide whether to create a judicial or a statutory exception for tribal sovereign immunity, it may very well make decisions like it made with respect to the United States about a statute of limitations or exceptions for adverse possession claims or things that Congress is in a position to weigh and create a comprehensive solution. I think there would be Mrs. O'Connell, there was one sentence in your brief that really leapt off the page, for me anyway. It's the one between pages 23 and 24, where you say the Respondents, the Lundgrens, you're asking, well, what alternatives do they have? And you say the Lundgrens could, for example, log trees on the disputed strip, commence building a structure, or take other similar actions that would induce Petitioner to file suit. Is that really what you want them to do? There's a dispute about this piece of property, and you say, well, go pick a fight, go cut down some trees. That's a surprising position for the government to take. That alternative way of resolving the dispute is laid out in this Court's decision in Block v. North Dakota. In that case, the Court said, even though the State's claim against the United States to quiet title to land was barred by the statute of limitations, that didn't mean the title dispute was resolved. The State could continue to assert its right to the property and force the sovereign to sue you. So if the tribe, I gather, said they're going to build their own fence right on the line, and you're saying the Lundgrens should jump over the fence with the chainsaw and start cutting down trees. And when the tribe comes up to them, they're supposed to say, oh, Mrs. O'Connell said I should do this. I think the — well, they probably shouldn't say that. The point that we're trying to make here is that when a suit is dismissed because the sovereign has immunity, when a quiet title suit is dismissed in those circumstances, it doesn't mean that the tribe now owns the land. It means title is still not settled. And so the Lundgrens could continue to assert their ownership of the property and force the tribe to quiet title. And I think one other thing I'd like to point out there is that the land into trust process is another way that this dispute could still be resolved in this particular case. The tribe bought this land with the intention of asking the United States to take the land into trust for the Indian tribe. In that process, the tribe has to present the Secretary of the Interior with its deed and with title insurance, and then the Secretary conducts an investigation to see if there are any infirmities to the title. And so in this case, obviously there is another claim to the land, and the Secretary would require the tribe to get that settled, either through a negotiation or through its own quiet title action, before that strip would be taken. What difference would that make? Let's say the land were in title. How should that affect our analysis, if at all? If the Secretary took the land into trust. Let's say this land were in trust. Then what? Why should that make any difference? Well, then the United States would have title to the land, and the Lundgrens' claim would have to come under the Federal Quiet Title Act against the United States. There would be an adverse possession exception in those circumstances. So what, I mean, Kiowa was 20 years ago. I did really think Congress would do something. It's done nothing. All right. So in the meantime, tribes, it's not necessarily this one, but many tribes have business interests all over the country. And so how do these in practice, how are they getting resolved, if there is sovereign immunity all over the place? What happens? Congress does step in from time to time. So there are certain statutes where Congress has abrogated tribal sovereign immunity with respect to specific water settlement agreements or required the tribe to waive its immunity in order to exercise statutory jurisdiction under various statutes. But I think the footnote eight problem in Bay Mills doesn't come up here because unlike a tort plaintiff that's just out of luck if it can't sue the tribe because of immunity, title is not settled here. There are other options for resolving who owns the property than suing the tribe. Thank you. Roberts. Thank you, counsel. Mr. Miller. Mr. Chief Justice, and may it please the Court. A core attribute of sovereignty is the authority to adjudicate disputes over the ownership of real property within the sovereign's territory. That authority is not displaced simply because another sovereign claims an interest in the property. Mr. Miller, this is an argument that you oppressed vigorously here. But it has nothing to do with the decision of the Washington Supreme Court. It was nothing about a movable property exception. So are you defending, are you presenting an alternative while at the same time defending what the Washington Supreme Court decided? Or are you saying never mind what they decided, this immovable property exemption takes care of it? We are defending the holding of the court below. It's set out at pages 7A to 11A of the Petition Appendix under the heading in-rem jurisdiction. And what the court below said is that the courts of Washington have in-rem jurisdiction to resolve disputes over real property within the State of Washington. And I think to understand what that means, you have to look at this Court's decision in Schaeffer v. Heitner, and that explains that the difference between an in-rem and an in personam action, it's not about pleading or who the defendant is or how you write the caption. There's a substantive difference, and it turns on the source of the court's authority. Counsel, Justice Ginsburg's question, I really would appreciate an answer to that because it troubles me, too. The State of Washington relied on this Court's decision in Yakima and said that there was no impediment to suit. But Yakima, of course, was just an interpretation of the General Allotment Act and had nothing to do with in-rem authority writ large. And I didn't see anything in your brief defending the reasoning of the Washington Supreme Court and its analysis of Yakima. So can we just put that aside and agree that that was wrong and then move on to the rest of your brief? Well, we agree that Yakima was a statutory case. Its holding is not controlling here. Okay. I appreciate that conception. I would say, however, that Yakima reflects an understanding that there is a difference between control of a property and— Fine. But you agree that Yakima doesn't control. Yes. Okay. All right. And in that case, why isn't it enough for the day for this Court to resolve a split of authority over the Yakima controls in cases like this and return it to the Washington Supreme Court, where you can present all these wonderful arguments you've raised here for the first time? Well, a couple of reasons, Your Honor. First of all, the argument that we are presenting is a response to the argument that Petitioner has presented. So Petitioner's argument in their opening brief, it's very clear and straightforward and it has two parts. No, I understand that. I spot you all of that. My question, though, remains, you've raised a new ground for defending the result below and abandoned the ground that was actually asserted. This Court doesn't normally resolve questions like that in the first instance. Normally, it's a question of review, not first view. Why shouldn't we exercise discretion here and wait? Again, a couple of additional reasons. First, although the court below did not use the language of the immovable property rule, its references to in-rem jurisdiction, its emphasis on its authority over land within the State of Washington necessarily encompasses the same concepts that I don't think that that's quite true, Mr. Miller, unless, I mean, tell me if I'm wrong. But I made a little Venn diagram for myself. And it turns out that immovable property and in-rem jurisdiction, there's a large sphere of overlap, but there are definitely places where the two do not overlap. So, you know, you have your in-rem about land, that's the sphere of overlap. But you can have immovable property, that the action is about land, and have an impersonem suit, that would be a typical trespass, something like that. Then on the other side, you could have an in-rem suit that's about movable property. Or you could have an in-rem suit that's about land within the jurisdiction. And that would not fall within the sphere, excuse me, within the reservation itself, within the Indian reservation. And that would not fall within the sphere of overlap. So I think that there are real differences in the scope of the immovable property exception on the one hand, and an in-rem exception on the other hand. And clearly, the Washington court talked about the in-rem exception. Now you're coming in, and you have an extremely strong argument about this immovable property rule. But it's not the same argument that the court in Washington made. It's not the same theory as Justice Gorsuch pointed out. It's also just not the same categorization. With respect, Your Honor, I think it is the same categorization, and I want to explain why. So to take the second part of the Venn diagram, it is true in the abstract that in-rem jurisdiction can be more than immovable property, you know, in the admiralty and bankruptcy and so forth. But if you read the decision below, there are 34 references to land. There's nothing about boats. The first sentence of the substantive part of the analysis begins with the statement that the superior court has jurisdiction in actions, in-rem jurisdiction in actions involving real property. So the fairest reading of the decision below is focused on land. But there's still a question of where is the land? Is the land on the reservation or is the land outside the reservation? If the land is on the reservation, I took you to agree with the point that that's the prince's land, and so the prince would be immune from suit. Well, two points on that, Your Honor. First, in the brief in opposition, in our formulation of the question presented, we emphasized that the case involved off-reservation land, so we raised that clarification at that stage. On reservation land, the analysis would be somewhat different if it is fee land on the end, and the Court doesn't need to resolve that. But if it's fee land on the reservation, we read Plains Commerce Bank to say that that is land that is not subject to tribal jurisdiction. Kagan. I guess what I'm saying is that it becomes much a different question, a more complicated question if you ask about a broad in-rem exception. Or, you know, in some ways the in-rem exception is broader, in some ways it's narrower. It just becomes a different question if you ask about in-rem exception, one which does take you into this question of what happens if the land is on the reservation. Then if you say, look, under the immovable property rule, if one sovereign owns land in another sovereign's territory, that sovereign is subject to suit there. That's not a general in-rem question. It's a question about the immovable property rule. But, you know, given, going back to what I said earlier about, you know, under Schaeffer, what in-rem jurisdiction is, it reflects an exercise of the power of the forum State over the property. And when you're talking about off-reservation land, in-rem jurisdiction is an exercise of the sovereign's power over the property. Ginsburg. It's odd that you bring up Schaeffer against Heitner, because the whole effort in that case was to say, you know, there's historic understanding why we divided things into in-persona and in-rem. But this Court said we wanted to make it clear that the notion that things have any rights is fanciful, anything is a claim involving a person. That is, people have rights in things. So Schaeffer said in the all-style in-rem proceedings, you will have to meet, you have to show the same kinds of connections to the lawsuit that you would have to show for in-persona. So the whole message, I think, of Schaeffer against Heitner is to break down that distinction and say we recognize that litigation is against contending humans or entities and we should not have different connections for in-rem versus in-persona. Well, we agree with that. But nonetheless, what that case teaches is that there can be different sources of the Court's power. And the Court addressed, you know, obviously that case was about the quasi-in-rem jurisdiction where you're just using the property as a hook to regulate some other activity of the defendant. But the Court had an extended discussion of the traditional in-rem case that we're talking about and said that in a case where the dispute is about property within the forum state, the minimum context test of international shoe is pretty much automatically going to be qualified because of, be satisfied because of the state's strong interest in assuring the marketability of property within its borders and in terms of the resolution of disputes about the possession of that property. I thought that Justice Ginsburg's question, which started off this line of questioning, was essentially this. Suppose there were no such thing as the immovable property exception. It just doesn't exist or doesn't apply in this situation. Would the decision of the Washington Supreme Court be correct based on the in-rem theory? If there were, I mean, no it would not. But as I've been explaining, the in-rem theory ultimately refers to the same underlying concepts about the forum's power. And we made this point at the brief. Kagan. And, Mr. Lowery, this is the way I sort of see what's happened in this case. And, again, you can tell me if I'm wrong. But you took over this case and you read this opinion, and you said this is not a very good theory. There is a really good theory. And I'm going to make that, and that's what good lawyers do. I'm not at all criticizing you. It's just, it's a new theory and a new, it's not just even a new argument. It's just a new, it's a completely new way to win this case. We took over the case and read the other side's brief. And Petitioner's brief says tribes should be treated just like other sovereigns, and other sovereigns would be immune in this kind of case. And we're saying, no, they wouldn't. Well, but you – That's not quite right, though, because we know the United States would be immune from this suit, right? No, Your Honor. Well, adverse possession, I think everyone acknowledges that the United States would not be subject to a suit like that. Maybe you can tell me why that's wrong in response to Justice Ginsburg's line of inquiry. But assuming it could be immune, here, if the land were in trust, it would be the same as the United States' land. And so it is possible that a sovereign could be immune from this kind of suit, right? If the land were in trust, the sovereign immunity of the United States would bar the suit. But the reason I say the United States would not be immune from this kind of suit is this is a suit challenging title to property owned by one sovereign within the territory of another. I understand, but if this were in trust, and therefore property of the United States, you'd agree sovereign immunity would bar this suit? Yes. The Quiet Title Act's exception for trust or restricted Indian lands would bar. As Justice Kagan suggested, you're a good lawyer, but you're not the one who came up with this the first time in this litigation, were you? I mean, did the government raise the immovable property argument in its brief? That's absolutely right, Your Honor. They did. Did that happen because you had a conversation with the Solicitor General in which the Solicitor General knew which sort of arguments you were going to make? We had a conversation with the Solicitor General. Look, sending it back, sending it back, I think it is a, we could try to decide it or we could say review, not first view, all right? So one of the things in ways in my mind is this, that reading the words immunity from suit broadly, extending we're not even Canada, we dare to go, all right, there's a lot of language in cases that does say that. So I'm pretty curious whether anyone else is, but I'm pretty curious for the last 20 years, how have things gone? I mean, Congress hasn't acted, tribes are in business across the country, there must have been controversies, what's actually happened? And one argument for leaving things alone is, we've all survived. And an argument the other way is it's very anomalous, could give the tribes more immunity than foreign countries would have. All right, so why shouldn't we send it back and get all this out on the table and we have the views of other courts and we also have a more extensive set of arguments? Because what has happened is that there is a conflict in the lower courts and these issues have been fully ventilated in the lower courts. So the other state high court decision on the same side as Washington. I'm sorry, I'm actually quite interested in that because I went to look, there is a split on Yakima and what Yakima means or doesn't mean. But I don't know that the courts below have been looking at this immovable property theory. The other state high court decision on the same side as Washington is the North Dakota decision in Cass County Joint Water Resources District. And that has a several paragraph discussion of Georgia against Chattanooga. So the concept is there in the decisions below. On the other side of the split, the leading case is the Second Circuit's decision in Oneida against Madison County, this court granted cert in that case back in 2010 and it was mooted after the tribe ways of unity, but- If we let it go back, it's going to get aired fully and we'll have a split. According to you, might or might not have a split. That would require us to take the case again on this theory, but it still doesn't explain why we shouldn't follow our normal practice and just say relying on Yakima is wrong, and there might be something else. But you take care of it. In the first instance. Because you already have a split in which these issues have been ventilated in the lower courts. You have an issue here that the lower court's decision wasn't just county of Yakima. It was also about the state's authority over land within the state. And we made that point in the brief in opposition. At page six, we said that a state's jurisdiction to control the ownership and its territory is a core sovereign prerogative. That's exactly the same idea, just less memorably phrased. As then Judge Scalia's observation in Reclamante's about territorial sovereign's primeval interest in controlling real property within its domain. What would be, what's your objection? The tribe has suggested that you wait until the trust proceedings, at which time you'll have an opportunity to object to the government's taking the property in trust because you'd say part of it is ours. What's wrong with that? Well, we would object, and under the land into trust regulations, the existence of this encumbrance on the title should preclude taking the land into trust. But if we succeed, we convince the secretary not to take the land into trust. That doesn't actually get us anything. We still have the tribe asserting an interest in land that under state law belongs to us. That's a cloud on the title. It makes the title non-marketable, and that is a real immediate and concrete injury for which Washington law, like the law of pretty much every state, provides a remedy because all this discussion of sort of sovereignty can be a little bit abstract, but there's a real practical reality underlying it. And that's that every government, and really every organized society, has an interest in having some mechanism for determining who owns what pieces of land. And the tribe's position would create situations like this one, where that's impossible. The tribe's position would also undermine the ability of the state to acquire land that's needed for public use. And Justice Alito, you asked a hypothetical about blocking condemnation that's not hypothetical at all. The North Dakota case I mentioned earlier was a case where they were going to build a dam, and they had plotted out the area that was going to be flooded by the dam. And the tribe purchased one and a half acres in the middle of that area, and then attempted to assert its immunity to block the entire project. So that's — and North Dakota went the same way as Washington and rejected that assertion of immunity. But that's the sort of thing that one would expect to happen under the rule. Alito But does the record show — this parcel of land is about an acre, is that correct? Miller That's correct, Your Honor. Alito Does the record show what it's worth? Miller No, I don't believe there's anything in the record on that. The — as I said earlier, this argument has been presented in response to the argument that Petitioner made that they should be treated like other sovereigns. And it's not just what they said, it's what this Court has said. Justice Kagan, you mentioned earlier that, you know, under Bay Mills and under Santa Clara Pueblo, what tribal sovereign immunity is, is the common law immunity from suit traditionally enjoyed by sovereign powers. So, you know, if the Court is going to consider, you know, what cases fall within the scope of sovereign immunity, it has to do that by reference to, you know, what the traditional rules are for other sovereigns. Kagan Yeah, I mean, as I said, I think you have a pretty strong — you know, it looks pretty good to me right now. I am a little bit worried about what Justice Sotomayor said, which is, you know, if we really looked harder, maybe there would be something else that would cut against this theory. I'm a little bit worried that there aren't amici who knew about this theory. The only one who did is really the Solicitor General, because the Solicitor General generally talks to parties as the litigation goes forward. And I think it would be, I have to say, just a bad way of dealing on our part if we allowed parties to come in, even with the best of faith, and said, I have a new theory for you, that really the only people who got a chance to reply are the petitioners in a 20-page yellow brief. I mean, I think the issue was out there. Anyone who read the cases cited in the petition for writ of certiorari would have been aware of these concepts. They're expressed in the North Dakota opinion. They were expressed by petitioners in the Madison County case when this Court, from the Second Circuit, when this Court granted cert, you know, seven years ago. So anybody who was looking at the legal landscape of what the circuit conflict was would have been aware of these issues. Anybody who read the decision below and looked at the Court's references to in rem jurisdiction and asked themselves, you know, what does it mean to say that a State has, you know, in rem jurisdiction to exercise power over the land within its sovereign domain would have been aware of the issue. Anyone who read this Court's decision in the City of Sherrill, which doesn't address this precise question presented, but goes a long way toward saying that, you know, when you have land that's within a State, the fact that a tribe has, you know, come along and purchased it on the open market does not divest the State of sovereignty. It's still subject to State sovereignty, not tribal sovereignty. You know, all of those things that were out there, you know, should have put parties on notice, you know, as a, and in addition, the, you know, the foundational principle that, as I said earlier, you know, the scope of sovereign immunity under this Court's precedence is determined by reference to the law that governs other sovereigns. I mean, just last year in Lewis, you know, the Court applied that understanding of how sovereign immunity works. You know, that was a case where the tribe came in and asserted that its sovereign immunity barred the suit. Breyer, I mean, I see in terms of fairness between the parties, but we have, you know, a dozen tribes and the National Congress of American Indians and so forth. They all have an interest in this, and they'd have to say squarely, why should tribes have more immunity than Canada, Mexico, whatever? And I don't know that they've addressed that squarely. And that's what's sort of moving me, to tell you the truth. I mean, they, several, certainly petitioners in their opening brief, as well as several of the non-governmental amici, did address that question and said that tribes should have the same immunity as other sovereigns. So, you know, they have addressed that question. That's on your side, but do you think there are also people on their side? Well, no, I'm referring to the people on their side. Yeah, they got this squarely in these three amici, in the three, you know, light green amicus briefs, which I did look at, but I haven't looked at it with that directly in mind. I don't know that they all did, but we cited a number of them in, it would be early in Section D of our brief. Mr. Miller, you argue forcefully and you argue intelligently, but I don't know why, if it was so obvious to everyone, and you didn't author the brief in opposition to certiorari, but if it was so obvious that this was the case, why doesn't the brief mention the immovable property exception? You say it's obvious, but it obviously isn't obvious. It doesn't mention it in terms, I've cited to you the qualification of the question presented in the brief in opposition that refers to off-reservation land, the passage on page 6 that refers to the sovereign prerogative of the State, which is just a, I mean, it is not explicit, but it is another way of getting at that concept. I mean, if the Court has no further questions, we ask that the objection be affirmed. Thank you, counsel. Mr. Hawkins, you have a minute left. It is fundamentally Congress's jobs, not ours, to determine whether or how to limit tribal sovereign immunity. That comes from Bay Mills 2037. Justice Breyer, you asked, how have things gone over the 20 years, and how are these issues addressed? These issues are addressed every day, in contracts and in land transactions, by the tribe either agreeing to weigh voluntarily or negotiating how disputes will be resolved. So there is a mechanism, and that's between the parties who understand their place. Even in this situation, had the Lundgrens offered an opportunity to negotiate in recognition of the tribe's immunity from suit, we would have engaged in that same process here. I'm sorry. There was a negotiation, and I thought the negotiation resulted in the tribe saying, no, we want the land. We won't take money for it. We won't exchange parcels for it. The Lundgrens wanted to pay you money or exchange parcels. And the tribe said no. Justice Sotomayor. So what were they supposed to do next? There was, what I said was, if the Lundgrens understood our immunity from suit, then the negotiations would be different. How? When you said no. Because they would not have the opportunity to seek the legal relief that they have sought here. We respectfully ask that the judgment below be reversed. Thank you, counsel. The case is submitted.